**UNITED STATES of America,**
**Plaintiff,**

**v.**

**531.10 ACRES IN ANDERSON COUNTY, SOUTH CAROLINA, and Duke Power Company and Unknown Owners, Defendants.**

**Civ. A. No. 2814.**

United States District Court
W. D. South Carolina,
Anderson Division.

Aug. 3, 1965.

John C. Williams, U. S. Dist. Atty., Greenville, S. C., for plaintiff.

David L. Freeman, Watkins, Vandiver, Freeman & Kirven, Anderson, S. C., for Duke Power Co.

SIMONS, District Judge.

The issues before the court in the instant case are based upon objections by plaintiff, United States of America, to the Report filed December 31, 1963, of a Land Commission appointed in condemnation proceedings for the Federal Hartwell Dam Project on the Savannah River. The order by Judge C. C. Wyche, Western District of South Carolina, December 4, 1961, appointing the Commission pursuant to Rule 71A of the Federal Rules of Civil Procedure, provided in part that the Commission would:

> " * * * take testimony * * * regarding just compensation and any question of title which may arise in each of the tracts, and render a full report to this Court with regard to said questions and such other questions as may arise, together with their recommendations concerning their conclusions of law and fact." [1]

No exceptions to this order were taken by the Government or the landowners.

The property of defendant, Duke Power Company, with which this suit is concerned consisted of 503.7 acres of land and a hydroelectric dam and power plant which was built in 1898, by Duke's predecessor in title. The dam and power plant were situated on the Seneca River sometimes referred to as the Keowee River at Portman Shoals and were generally known as the Portman Plant. The impoundment of waters by the Federal Hartwell Dam project flooded the entire length of the Seneca and inun-

---

[1]. The Commission was appointed by Judge Wyche to hear this as well as several other cases.

dated the Duke Power Company project. The Seneca is a tributary of the Savannah River, upon which the Hartwell Dam is located.

The suit was commenced by the filing of a complaint without a declaration of taking on October 21, 1960. By stipulation it is agreed that December 9, 1960 was the date of taking.

Plaintiff has objected to the findings and conclusions of the Commission that the Seneca was a non-navigable stream, and that defendant was entitled to compensation for the taking of its land, and the dam and power plant situated thereon. The Government also objects to the Commission's measure of value as to the land, the power plant facilities, and to the total award made in favor of Duke in the sum of $528,158.00.

The question of the navigability of the Seneca is of foremost importance in this case, as well as in the companion case involving the condemnation of the property of J. P. Stevens Co., Inc., at its textile plant located on the river a few miles upstream from Portman Shoals.[2]

By stipulation of the parties the testimony relating to the vital issue of the navigability of the Seneca River was taken for consideration in this case, and also in the condemnation proceeding against the J. P. Stevens & Co., Inc., property. In addition, the Commission's findings of fact and conclusions of law on the issue of navigability were the same in both condemnations; and objections to the Report of the Commission made by the Government in the condemnation of the property of J. P. Stevens & Co., Inc., were argued before me at the same time arguments were heard in this case.

A full day was devoted to oral arguments, briefs on all questions raised have been submitted by counsel for the parties. Their briefs as to the navigability question are addressed to the Duke and Stevens cases since that issue is identical in both. I have arrived at the same conclusion in each case insofar as the issue of navigability of the Seneca River is concerned.

Two basic questions are raised by the Government's objections to the Commission's Report in this case: ██ Is the Seneca River a navigable stream of the United States? ██ Is the Commission's total award of $528,158.00 so clearly erroneous as to preclude affirmance by this court?

The Government contends that Duke Power Company is not entitled to compensation for its hydroelectric facility upon the following grounds: [a] That the facility was located in the bed of a navigable stream of the United States in which plaintiff had a paramount servitude which relieved it of any obligation to pay for structures located in beds of navigable streams, upon the premise that hydroelectric values on navigable streams are non-compensable. United States v. Twin City Power Co., 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 [1956]. [b] That even if the Seneca is found to be a non-navigable tributary of the Savannah River, plaintiff would not be indebted to defendant for its use and control of the flow of the non-navigable tributary in improving the navigability of the adjacent navigable stream, under the Commerce clause of the Constitution. United States v. Willow River Co., 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 [1945]; United States v. Chicago, M. St. P. & P. R. Co., 312 U.S. 592, 61 S.Ct. 772, 85 L.Ed. 1064 [1941]; United States v. Grand River Dam Authority, 363 U.S. 229, 80 S.Ct. 1134, 4 L.Ed.2d 1186 [1960].

Before the Commission and in its arguments and briefs before me the defendant landowner not only strongly urged that it was entitled to just compensation for its facilities taken and flooded by plaintiff because the Seneca was non-navigable; but it also asserted alternate positions alleging that it was entitled to compensation for said facilities even though it were determined that the stream was in fact navigable. These

2. United States v. 531.13 Acres and J. P. Stevens & Co., Inc., et al., D.C., 244 F.Supp. 895.

alternate positions were not considered and passed upon by the Commission because of its determination that the Seneca was non-navigable. Neither have I considered such alternatives, inasmuch as I concur in the Commission's determination that the Seneca is a non-navigable stream, and that plaintiff's sovereign servitude does not extend to such non-navigable waters under the facts presented in this case.

The court will first consider the Government's objection to the Commission's conclusion that the Seneca River is not a navigable stream of the United States.

Plaintiff stoutly urges that the question of navigability is one of law for the court rather than the Commission to determine in the final analysis; or that it is a mixed question of fact and law, and that the "clearly erroneous" rule does not apply to the court's review of the Commission's findings and conclusions in this regard, citing United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 [1940]; United States v. 91.69 Acres in Oconee County, S. C., Excelsior Mills, Inc., 334 F.2d 229 [4th Cir. 1964]; United States v. Waymire, 202 F.2d 550 [10th Cir. 1955]; United States v. 5,677.94 Acres in Montana, 162 F.Supp. 108 [D.C. Mont.1958]. In view of this position of the Government, I have reviewed the record fully, have considered all of the evidence presented by the parties to the Commission, and have made an independent determination of my own as to the navigability of the Seneca River. In reaching this judgment all of the Government's exceptions to the findings of the Commission have been considered; and as such exceptions are too numerous to repeat, I shall comment only upon those I deem especially significant in making my determination.

The Seneca is a stream approximately 27 miles long formed by the confluence of the Keowee River and Twelve Mile Creek. The Seneca and the Tugaloo Rivers come together to form the Savannah River. At the confluence of the Seneca and Tugaloo was formerly the site of a town called Andersonville which has long since been abandoned. Navigation was effected on the Savannah River up to that point. Portman Shoals, where defendant's dam and hydrolectric plant were situate, is approximately eight miles upstream on the Seneca above the old site of Andersonville.

The Seneca-Keowee River was formed by the confluence of several smaller mountain streams originating in the Blue Ridge Mountains of North Carolina. These tributaries of the Savannah River are fairly swift streams in which are located many shoals. Witness Stribling, an engineer employed by Duke, testified that he made a survey of the shoals in the Keowee-Seneca River in 1942 finding 86 shoals in the 54 miles from the mouth of the Keowee to Andersonville at the head of the Savannah River. Portman Shoals, the most formidable of all, extended over a three mile area. The river fell 52 feet, or an average of 17.37 feet per mile, over this three mile stretch. This shoal area presented the most burdensome obstacle in navigating the river. Stribling testified that in making the survey in 1942 he found the depth of the river varied from less than one foot to 2½ feet over most of the shoals; and that it was impossible to float his canoe on many of its stretches.

James W. Blair, a witness for plaintiff, made a survey of the Seneca River during 1929–1930 for the Corps of Engineers as part of project to determine the possibilities of the full development and utilization of the entire Savannah River system. He testified that the Seneca was a "nice meandering" stream with well-defined banks and some bars in the river. He found the deep run or "thalweg" of the river to average about three feet. This depth varied with the width of the river.

Stribling and Blair presented the most graphic account of the physical characteristics of the river. There is no evidence in the record to indicate that the river underwent any marked changes in its physical characteristics over the years.

The question of navigability of a stream is a federal question which must be decided under federal law. United States v. State of Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 [1931]. United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 [1926]. Of paramount consideration is the susceptibility of the river or stream for use as a channel for useful interstate commerce in its natural state; and not necessarily the extent and manner of the actual use; and a river is navigable in law which is navigable in fact. Daniel Ball, 10 Wall. [U.S.] 557, 19 L.Ed. 999; The Montello, 20 Wall. [U.S.] 430, 22 L.Ed. 391. In United States v. Appalachian Electric Power Company, 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 [1940], the court pronounced that the test of navigability is not to be confined to the natural and unimproved condition of a river or stream, but that "it is proper to consider the feasibility of interstate use after reasonable improvements which might be made." The Court clarified this requirement, however, by stating that "[t]here must be a balance between cost and need at a time when the improvement would be useful." 311 U.S. at page 407, 61 S. Ct. at page 299.

The burden of proof rests herein upon the Government to establish the Seneca's navigability. United States v. Rio Grande Dam and Irrigation Co., 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136. [1899].

Considering the legal principles cited herein, I find that plaintiff has failed to establish that the Seneca is a navigable stream of the United States; and on the contrary I have concluded that the Commission was clearly correct in its determination that it is non-navigable, and that no useful channel for commerce ever existed on the Seneca at any time in his history.

A review of the evidence presented before the Commission by both parties reveals that there is a paucity of information relating to the question of the navigability of the Seneca River. Each party relied principally upon historical facts to sustain its position.

The Government presented Dr. Gustavus G. Williamson, Jr., Associate Professor of Economics at the University of South Carolina, as an "historical witness". Defendant's "historical witness" was Dr. Daniel W. Hollis, Professor of History at the University of South Carolina. Both of these men were well qualified to testify. Dr. Williamson concluded that there was navigability on the Seneca-Keowee River during the early nineteenth century, while Dr. Hollis concluded that there never had been any substantial, economically useful navigation of the river. The opinions of both experts were predicated generally upon the same information, with each arriving at varying determinations as to the question of navigability.

The most significant historical evidence relating to navigation on the river as testified to by both Dr. Williamson and Dr. Hollis, is as follows:

In 1791 the General Assembly of South Carolina passed an Act for opening and improving the navigation of several rivers throughout the State, including the Seneca and Keowee Rivers. In 1811 the South Carolina Legislature passed legislation which recognized the assistance of boat sluices on the Seneca. In 1819 the Legislature established a Board of Public Works to take over the improvement of navigation on state rivers. In 1820 the Commission established by the 1819 legislation made its first report to the Legislature concerning possible improvements of navigation on several rivers. This report stated in part:

"An examination of the principal shoals of the Keowee River [Seneca-Keowee] was made during the summer, Portman Shoals where the River falls 52½ feet in 2 miles, present a serious obstacle to the improvement of this river. The fall is too great to be overcome by opening channels in the bed of the river, and the fact of the country near the banks is so broken and precipitous as to render any improvement by a

canal and locks a very expensive undertaking not warranted by the extent of navigation above those shoals."

The Board of Public Works which was created by the 1819 legislation was headed by a Colonel Blanding around 1820. In a report made to the Legislature about this time, Colonel Blanding considered the Seneca to be navigable, having but one difficult shoal in a distance of nearly 30 miles, that at Portman Shoals. He also noted that it was doubtful whether navigation could be effected for ascending boat traffic over Portman Shoals, but stated that boats carrying 40 or 50 bales of cotton had descended over the shoals from the mouth of Twelve Mile Creek. Colonel Blanding made a subsequent report in 1824 in which he told of a trip he made up the Seneca River; he reported essentially that all of the shoals in the river were very gradual and easily sluiced except at Portman Shoals, where the stream was rapid, much obstructed by rocks, with numerous ledges crossing the stream. He determined, however, that a sluice navigation through Portman Shoals could be rendered easier and safer than on many parts of the Savannah River. He entered at this time into contracts with the Lawrence brothers and Archibald Bowman to construct a sluice through Portman Shoals.

In 1828 the South Carolina Legislature passed another Act concerning the public works of the State, and provided that the Superintendent of Public Works should proceed to enforce the contracts entered into [by Blanding] respecting the navigation of the Seneca River. In 1829 Whitner, the Superintendent of Public Works, reported to the Legislature as follows:

"On the 14th and 15th of October, I proceeded to make [the] examination of the Seneca. The sluicing of this river had been let out in two contracts, in June, 1824, to Archibald Bowman, and to James and Elisha Lawrence. The river was in a favorable state for the examination, being some inches lower than a common summer river, and the water very clear. I found that the contracts had been substantially complied with, except in a few instances, which it is not necessary to embody in this report. These defects in the work of the Messrs. Lawrence were pointed out to them on the spot, and on their agreeing to have the additional work done speedily, I have concluded to give them this opportunity before taking any other steps. In Bowman's work also, there was found some deficiency, but as his contract has been cancelled, I have only felt myself at liberty to request of him to do some additional work where it seemed most important, and which he has promised to do. * *. "The river has been greatly improved by the work done on it, but in some instances the *benefit is confined solely to the descending trade, for in rendering that less dangerous, the ascending navigation has been made more difficult*. The great obstacle is Portman's Shoals, where, in one instance, the fall is upwards of six feet in about one hundred yards. In such a place, a straight sluice is necessary to enable boats to descend with safety, while a more winding course, by lengthening out and breaking the force of the fall, is just as necessary for ascending. *This navigation therefore can only be made to answer any very useful purpose, by having double sluices through the most difficult shoals*." [Emphasis added].

This was the last report concerning State efforts to render the river navigable. It does not appear that the Federal Government ever undertook to study the stream's navigational possibilities, nor did it make any efforts to improve its navigation.

In addition to the official reports mentioned above, historical documents were presented to the Commission in which different individuals had spoken of the Seneca and Keowee Rivers as being navigable. The first of these reports, relied upon by Dr. Williamson, was a statement

made some time prior to 1808 by a Dr. Edward Darrell Smith to the effect that the Seneca River and Portman Shoals had recently been made navigable, and that boats could be safely navigated down the Seneca to Augusta. Dr. Williamson however admitted that he found this statement in an appendix to a work entitled "Ramsay's History", and that historically speaking, this was a secondary source. Furthermore, Dr. Hollis during his testimony exhibited a petition signed by residents of the Pendleton area in 1821, seeking to have the Seneca River made navigable, and one of the signatures appearing on this petition was that of the same Edward Darrell Smith who had made the above statement prior to 1808.

The Government also relied upon a statement made in 1818 by one Robert Mills, a civil and military engineer, that the Seneca River was navigable for boats drawing 2 or 3 feet of water during the rainy season. There was another report by a Colonel Gresham, included in the papers identified as the "German Colony Protocol", in which he said in 1849 that the Seneca River was navigable for any boats that went from Augusta to Andersonville. However, Dr. Hollis stated that he could find no account of the German Colony using navigation on the Seneca River; and he reached the conclusion that such report above was made as an inducement to interest prospective settlers in the area.

There is no evidence of any traffic on the river by the early settlers or the Indians prior to the Nineteenth Century.

■■ The only evidence of any actual commercial use of the river by boat was recounted by David Lawrence, witness for the Government who testified by deposition. He stated that his father and another man built a boat and used it to haul cross-ties and lumber over a 12 mile stretch of the river above Portman Shoals during a six year period ending about 1896. He also testified that there were some instances of logs being floated down the Keowee-Seneca above Portman Shoals. All of this use of the river was entirely intrastate, and there was no intimation in the record that it could have been extended through the hazards of Portman Shoals, so as to "form a continued Highway" over which commerce might be carried on with other states and foreign countries. The Daniel Ball, 10 Wall. [U.S.] 557. Lawrence, who stated that he was 86 years old at the time of the taking of the deposition, also related a story about being told that his grandfather operated a trading boat along the Seneca River and navigated Portman Shoals. The defendant objected to this testimony as being hearsay, and not coming within the family history exception to the hearsay rule. The Commission refused to receive and consider this evidence. I concur with the ruling of the Commission in this regard. Considering all of the testimony of this particular witness, his advanced age, the fact that his account of his grandfather's boat does not appear in any historical source concerning the river, and his lack of detailed knowledge concerning the alleged operation of this boat, this legend would have little probative value and fails to meet the prerequisites of truthfulness and accuracy. Even assuming that this evidence is competent, I do not feel that it is sufficient to tip the scales in favor of navigability, nor does it establish that the Seneca was a useful channel of commerce.

■ The Government also contends that two rulings by the Federal Power Commission determining that the Seneca-Keowee River was navigable are conclusive on the court, if supported by substantial evidence. These rulings were issued ex parte and without evidentiary hearings. They did not represent a judicial determination. The same contention was made by the United States before the Fourth Circuit Court of Appeals in United States v. Appalachian Electric Power Co., 107 F.2d 769 [1939]. In rejecting this premise the Court said at page 791:

"In the first place, it is argued that in this proceeding the findings of the Commission with respect to nav-

igability and the effect of the dam on navigability, and on interstate commerce, are conclusive if supported by substantial evidence, which is asserted to be the case here. It is not disputed that the case can be judicially considered *de novo,* but it is said that the ordinary rule that findings of an administrative tribunal must be accepted, if supported by substantial evidence, must control the decision here on the facts. In our view this contention is not applicable to the present case. Section 23 does not provide for a 'hearing' by the Commission when a declaration of intention to build a dam is filed, but only for an 'investigation' by the Commission. Nor does the Act provide for any judicial review of the findings made. Nor is this case a statutory proceeding by way of appeal from or review of the Commission's action. Assuming that the finding of the Commission is a relevant fact for the consideration of the court, and that it is entitled to careful and respectful consideration as the opinion of a body informed by experience, nevertheless, it cannot properly be regarded as controlling judicial determination on the record in the case. Clearly the decision of the district court involved a constitutional question of the jurisdiction of the Commission in relation to the distribution of state and federal power, and of riparian property rights of the defendant. This, we understand, is not disputed so far as the action of the district court was invoked under the Rivers and Harbors Act; and it seems equally clear that the same must be true with respect to any jurisdiction of the Commission in this case. In that view it is clear that the district judge was required to determine the question of fact *de novo* on the record made at the trial before him. Crowell v. Benson, 285 U.S. 22, 58, 59, 52 S.Ct. 285, 76 L.Ed. 598; St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 51, 56 S.Ct. 720, 80 L.Ed. 1033; Baltimore O. R. Co. v. United States, 298 U.S. 349, 364, 56 S.Ct. 797, 80 L.Ed. 1209."

The decision of the Fourth Circuit in the above case finding the New River not to be a navigable stream of the United States was later reversed by the United States Supreme Court in 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243. The Government did not, however, in that case seek to have the court pass on the contention that the findings of the Power Commission should be conclusive if supported by substantial evidence and that proposition did not enter into the Court's decision. Therefore, I feel bound in the instant case by the principles enunciated by the Fourth Circuit in Appalachian, supra, as to the findings of the Federal Power Commission concerning the navigability of the Seneca-Keowee River. At most the Commission's findings as to navigability would constitute some evidence to be considered by the Commission and the court in determining whether or not the Seneca was in fact navigable.

The Government contends that the evidence in the record, which has been briefly referred to herein, conclusively establishes that the Seneca was actually used for navigation in historic times; and that it was also suitable for additional improvement for navigation. It further contends that efforts by the State of South Carolina to improve or make the Seneca-River a navigable stream dedicated the river to interstate commerce. Finally, it argues that the Commission adopted an erroneous test of "useful commerce" in making the determination that the Seneca-Keowee River was not a navigable stream of the United States.

It is true that there was considerable discussion and planning on the State level as to effectuating improvements on the Seneca-Keowee River with the view of making the stream a useful artery of interstate commerce, particularly during the period 1808–1830 referred to by the historians as the "internal improvements period." The record also reflects that there were instances where boats de-

scended the river down to Andersonville at the mouth of the Savannah River; however, the first report to the legislature in 1820 [set out in part above], after formation of a commission to study and make recommendations concerning improvements to make the Keowee-Seneca River navigable, reveals that state officials considered the necessary improvements to Portman Shoals too expensive considering the extent of navigation above these shoals.

Subsequent to this report efforts were made by Colonel Blanding to have the Lawrence Brothers and Bowman sluice Portman Shoals following his 1823 survey; however, this attempt was unsuccessful as documented by the report in 1829 of Whitner, Colonel Blanding's successor, which reported that useful navigation of the river could only be accomplished by making further improvements at Portman Shoals.

■ It is my conclusion that the reports made to the legislature in 1820 and 1829 show that it was doubtful in the beginning of the "improvements era" that the Seneca could ever be made navigable for useful interstate commerce at a cost commensurate with need; and in spite of the statements by various individuals that the river was navigable, the last report in 1829 by Whitner shows that efforts to make the river navigable to ascending and descending boat traffic had failed, and that any improvements made at Portman Shoals had failed to open the river to useful interstate commerce. I cannot agree with Government's contention that efforts by the State during this period resulted in a "dedication" of the river to interstate commerce. Had the State succeeded in improving the stream so as to make it navigable for useful commerce, then the situation would be different. Once a stream becomes "navigable" it retains that status, but here the efforts of the State obviously failed. All of these facts were fully considered by the Commission.

■ Of course, as aforesaid, the crucial test in determining navigability is not the actual commercial use of a river, or the absence of use. It is the susceptibility of the river for "useful interstate commerce" in its natural state or with reasonable improvements dictated by cost and need. United States v. Appalachian Power Co., supra. The Supreme Court has also asserted that use of a river by private boats may "demonstrate[s] the availability of the stream for the simpler types of commercial navigation." United States v. Appalachian, supra. United States v. State of Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 [1931].

■ The evidence in this case verifies that there had been some limited boat traffic on the river, and that it could in its natural state accommodate small flat boats. However, the only instances of trade and commerce carried on by boat were intrastate rather than interstate. Furthermore, the evidence indicates that the river was susceptible to having been made navigable at great cost by a system of locks and canals; but that the need definitely did not justify the cost during any period of history, prior to the coming of the railroad to the Piedmont, or thereafter to date of the development of the Hartwell Project. It is therefore my judgment that the cost of making the Seneca navigable in the legal sense, and a useful artery of commerce was so out of proportion to the use and benefits to be derived therefrom by the public that it was not reasonable or practicable to undertake such improvements.

It appears from the record that all of the witnesses, including those of the Government reached the same conclusion.

■ The Government contends, however, that even if the Seneca River is not a navigable stream, the flow of the stream is subject to the power of the United States arising under the Commerce Clause of the Constitution, because it is essential to the navigability of the Savannah River. There was no proof in the record that the hydroelectric facility operated by Duke Power Company at Portman Shoals in any way ever affected the navigability of the Savannah River.

Indeed, the only evidence presented showed that the Duke operation did not influence the flow of the Savannah in any manner. The Government argues, however, that if Duke had any right to maintain a dam on the river it could possibly have built a bigger dam, dredged out the river, etc., and thereby possibly affected the flow of the Seneca and in turn the Savannah. This court is bound by existing facts and cannot speculate and conjecture as to possible ways the Duke project under different circumstances may have affected the flow or navigability of the Savannah River. As it existed it had no influence on the Savannah, and consequently the United States had no greater interest in this non-navigable stream at the site of Portman Shoals than did the landowner. United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 [1917].

I conclude in accordance with the above findings that the United States has no paramount rights to the flow of the Seneca River; and that, therefore, Duke Power Company is entitled to be compensated for its properties, which have been inundated and made useless by waters impounded by the Hartwell Dam project located on the Savannah River.

The Commission in this case was composed of three able and outstanding members of the South Carolina Bar. It is clear that the correct legal standards were applied by them to the facts in the case regarding the navigability of the Seneca River; that its findings and conclusions in this regard were not clearly erroneous, but firmly supported by substantial evidence. Furthermore, as before stated, I have made an independent study and appraisal of the evidence, and have reached conclusions of fact and law as stated herein. Inasmuch as the findings of fact and conclusions of law reached by the Commission are in accord with my own findings, and supported abundantly by the evidence, they are hereby adopted and confirmed by this court.

Having concluded that Duke Power Company is entitled to just compensation for the taking of its hydroelectric facility, as well as its land, the court will now consider the Government's objections to the basis of the award and the amount of compensation found by the Commission. The findings of fact as to just compensation by the Commission must be accepted by the court unless clearly erroneous, and in the absence of manifest error, in accordance with Rule 53 [e] [2] of the Federal Rules of Civil Procedure, made applicable here by Rule 71A [h], 28 U.S.C.A. United States v. Carroll, 304 F.2d 300 [4th Cir. 1962]; United States v. Certain Interests in Property, etc., 296 F.2d 264 [4th Cir. 1961]; Cunningham v. United States, 270 F.2d 545 [4th Cir. 1959], cert. den. 362 U.S. 989, 80 S.Ct. 1078, 4 L.Ed.2d 1022 [1960].

The Government insists that the Commission erred [a] in not accepting the testimony of one of the Government's witnesses as to the value of the land taken; and [b] in concluding that the fair market value of newly created lake properties was too uncertain and speculative to be of probative value. As pointed out in the Commission's report, Witness Honnold relied upon by the Government to value the enhancement of the landowner's property around the newly created lake testified as to his knowledge of only one "acreage sale" of property bordering on the lake. The Commission correctly concluded that such testimony had little probative value in ascertaining the true extent of the increase in value of the landowner's property bordering on the lake and of the "back" properties. Indeed, the testimony of the Government's witness shows that property values around the lake were very unstable, had no well established market value at that time, and that better informed property owners quite adroitly were "holding" their lands until values did stabilize.

The question then remaining is whether the Commission's award of $37,500.00 as compensation for the total 503.7 acres taken by the Government based on a fair market value of $75.00

per acre is clearly erroneous? It should be noted here that witnesses for the landowner valued the property at the time of taking at $100.00 and $95.00 per acre. In valuing land taken in condemnation proceedings, landowner is not limited to value based upon its present use, but is entitled to be paid for the highest and best use to which such lands can be put within the reasonably foreseeable future. United States v. Carroll, supra.

The Commission's award is well within the range of the testimony of the witnesses, and is, indeed, substantially less than the value of the land attested to by landowner's witnesses. It is also noted that the values arrived at by the Government's witness for the 503.7 acres as of the date of taking, including the value of potential industrial sites within the acreage, was between $37,500.00 and $39,000.00. The Commission correctly concluded that value for potential industrial sites at the time of taking should be considered in making a final award.

Considering the Commission's report in light of the principles set forth in Carroll, supra, and the authorities cited therein, this court cannot say that the Commission's findings as to the value of the land taken are clearly erroneous; and consequently plaintiff's objections on this issue are overruled.

The Government also objects to the amount of the award of $500,000.00 by the Commission for the taking of the owner's hydroelectric facility, and to the method of evaluation used by the Commission. Specifically the Government excepts to the Commission's findings that the power facility had a useful remaining life of 20 years and to the Commission's measure of value e. g., the value of the plant to the Duke System.

The Commission rejected the "reproduction cost less depreciation, substitute facility", and "comparable sales" methods of evaluating the property, and arrived at its just compensation based upon the "capitalization of income" method, which it found to be more realistic under the circumstances of this case.

The Commission's selection of a capitalization rate of interest in excess of 6% in determining value of a 20 year remaining economic life has support in the record. The expert testimony estimated: [a] The annual average net income of Duke from its facilities from $47,350.00 to $53,200.00; [b] economic life from 15 to 30 years; [c] capitalization rate from 5.5% to 12%; and [d] value as capitalized from $362,000.00 to $789,000.00.

Valuation based upon "replacement cost less depreciation" method ranged from $662,000.00 to $953,000.00, and upon "substitute facility" method from $304,000.00 to $682,000.00. There is little difference in the opinion evidence as to estimated net average annual income of defendant from said power facilities; and the $50,000.00 figure used by the Commission is reasonable and fully supported by the testimony. "Capitalization of income" is a proper method of evaluating the property here; there being no readily obtainable comparable sales; and the "reproduction cost" approach is unwarranted in view of the obsolescence of the facilities in question. However, the Government argues that the interest rate and remaining economic life chosen by Commission to apply to the income are erroneous and without sufficient foundation in the record. With this, I cannot agree.

The Commission in its report has made full findings of fact which are amply supported by the evidence, and has applied correct legal principles to these facts. The Commission determined that Government's witness was off base in his judgment in assigning a low 15-year economic life to the facility, a high 12% capitalization rate, and a low firm capacity. The Commission also found that the true value of the plant to the entire Duke system should be given consideration in determining just compensation for the taking of the facility. The Government's approach to evaluation, straight income approach, did not take into consideration the loss of the transmission lines connected with the plant as a separate item; this factor was con-

sidered as an inherent part of the income producing facility, not a separate compensable item. In its consideration of the value of the entire facility to Duke's integrated power system, the Commission concluded that these lines were as important as the dam and power plant; and considered their replacement value, less depreciation, in the total award for the taking of the power facility.

 The Government valued the power plant at $362,000 without considering the transmission lines. The Commission determined the transmission lines to be worth $88,000.00, and considered their value in its total award of $500,000.00. It is quite apparent from the record that in general the Commission and the Government followed similar methods in evaluation of property, with the Commission refusing to accept several "judgment figures" relied upon by the Government. The Commission's findings are substantially supported by the evidence presented by both sides. It employed a sound and reasonable method in ascertaining the value of the plant to the owner, when "comparable sales" value could not be readily determined; and "replacement-less-depreciation" and "substitute facility" methods were not practicable in view of the age of Duke's existing facilities.

The findings and conclusions of the Commission with respect to the values of the land taken, and the dam and hydroelectric plant, are strongly supported by the evidence. Therefore, the Government's objections to the findings and conclusions pertaining to value and method of evaluation of these properties are overruled; and the report of the Commission is ratified and confirmed in full.

It is ordered that title to the lands described in the amended complaint is vested absolutely in the United States of America; that just compensation for the taking of the 503.7 acres of land is $37,775.00; that just compensation for the taking of the dam, hydroelectric plant, and transmission lines is $500,-000.00, less the value of the equipment salvaged, $9,627.00, making total just compensation to Duke Power Company of Five Hundred Twenty-eight Thousand, One Hundred and Forty-eight Dollars [$528,148.00], with interest from the date of taking, December 9, 1960, at the rate of 6 percent per annum.

It is further ordered that upon deposit by the United States of America of the sum of Five Hundred Twenty-eight Thousand, One Hundred and Forty-eight Dollars [$528,148.00], with interest at the rate of 6 percent per annum from December 9, 1960, the Clerk of this Court shall issue a Registry Fund check payable to Duke Power Company for all deposits by the United States of America for the taking of said property.