**Willie JONES, Jr., Plaintiff,**

v.

**DUKE POWER COMPANY, Defendant.**

**No. C–C–80–087.**

United States District Court,
W. D. North Carolina,
Charlotte Division.

Sept. 17, 1980.

---

Hugh G. Casey, Jr., Charlotte, N. C., for plaintiff.

E. Osborne Ayscue, Jr., Helms, Mulliss & Johnston, Charlotte, N. C., for defendant.

## ORDER OF DISMISSAL

McMILLAN, District Judge.

Defendant has moved for dismissal for want of subject matter jurisdiction. The issue—whether this court may exercise its maritime jurisdiction over a suit between citizens of the same state arising out of a tortious injury on Lake Norman in North Carolina—has been competently, extensively, whimsically, eloquently and interestingly briefed. Both sides have made detailed factual submissions consisting of affidavits and documents, ancient and otherwise. After reviewing these materials and relevant case law, the court concludes that the motion to dismiss must be allowed.

## FACTUAL BACKGROUND

This suit arises out of the death of plaintiff's wife, Elaine Faulk Jones, on January 7, 1980, while in the employ of defendant. As part of her employment, Mrs. Jones operated a seventeen–foot boat, owned by Duke Power Company, on Lake Norman. Lake Norman is (for this area) an uncommonly large body of water, thirty–two miles long, eight miles across at the widest point. It was formed in 1963 by defendant's dam at Cowan's Ford on the Catawba River, some sixteen miles northwest of Charlotte.

On January 7, 1980, Mrs. Jones and two fellow employees set out on the lake in the boat to take biological samples from the water and the lake bottom. When the boat did not return to dock at the close of the work day, a search was instituted. At approximately midnight, the boat was found adrift and down by the stern in the main channel, in the Lincoln County portion of the lake, near Hager's Creek. Two of the employees had drowned. Mrs. Jones's body was found aboard the boat, made fast by a line. Mrs. Jones had died of exposure.

Plaintiff, as Mrs. Jones's personal representative, filed this wrongful death action on March 13, 1980. The complaint asserts two claims, both based on maritime law. The first alleges that Duke Power breached its duty as employer to provide a seaworthy vessel, in that the boat lacked a radio and adequate rescue and flotation devices. The second claim, under the Jones Act, 46 U.S.C. § 688, asserts that the same omissions, and defendant's failure to initiate a prompt search, constitute negligence.

The Jones Act gives a right of action to "[a]ny seaman who shall suffer personal injury in the course of his employment," and to the personal representative of such seaman if the injury results in death.

Defendant, with its answer, moved to dismiss the complaint. The motion asserts that Lake Norman is not "navigable waters of the United States," and that, therefore, the complaint does not state a claim within this court's admiralty jurisdiction and does not state a claim under the Jones Act on which relief can be granted.

### DISCUSSION

■ To invoke the admiralty jurisdiction of this court under 28 U.S.C. § 1333, plaintiff must show, at the outset, that the injury in suit occurred on "navigable waters of the United States." E. g., Victory Carriers, Inc. v. Law, 404 U.S. 202, 204–05, 92 S.Ct. 418, 420–21, 30 L.Ed.2d 383 (1971). Traditionally, it has been thought that mere locality was enough to bring a tort suit within the admiralty jurisdiction. The view followed in this circuit requires, also, some

nexus to traditional maritime concerns. E. g., Crosson v. Vance, 484 F.2d 840, 842 (4th Cir. 1973) (denying admiralty jurisdiction over water skier's claim against two boat operators). See generally 14 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3676 (1976). On the pleadings, plaintiff has no difficulty meeting the latter prong of the jurisdictional test, counsel's interesting irrelevancies about pleasure boaters and water skiers notwithstanding. The wrong alleged is that the defendant employer, in breach of its legal duties under maritime law, sent the decedent, its employee, out on open water in an inadequately equipped boat. This certainly provides a more than substantial enough nexus to traditional maritime concerns. The question, then, is whether the boat was in service on "navigable waters of the United States." An affirmative finding on that issue is necessary to support admiralty jurisdiction, as well as to render plaintiff's decedent a "seaman" entitled to the protection of the Jones Act. See O'Donnell v. Great Lakes Dredge & Dock Co., 318 U.S. 36, 42–43, 63 S.Ct. 488, 491–92, 87 L.Ed. 596 (1943).

■ I. The Legal Test for Navigability.—The basic definition of navigable waters has stood for over a century:

"Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the Acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water."

*The Steamer Daniel Ball v. United States,* 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1871). This generality has been amplified by a number of clarifications and incremental additions. For example, a waterway, not navigable in its natural state, may *become* navigable through artificial improvements. *See The Montello,* 87 U.S. (20 Wall.) 430, 440, 22 L.Ed. 391 (1874).

 Once part of the navigable waters of the United States, a stream remains so, notwithstanding the fact that it may subsequently be abandoned as a commercial waterway because of technological or economic changes. In other words, "once navigable, always navigable." *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 408, 61 S.Ct. 291, 85 L.Ed. 243 (1940). A navigable stream need. not be navigable without interruption. The fact that the stream contains falls or shoals which require portages does not preclude a finding of navigability if the stream, despite the obstructions, is still useful in fact as a highway of commerce between states or nations. *The Montello,* 87 U.S. (20 Wall.) 430, 22 L.Ed. 391 (1874). Nor does the erection of man–made obstacles like dams, bridges, or piers, destroy the navigable character of a stream *if* it would be capable of use in navigation in its ordinary condition with the obstructions removed. *E. g., Economy Light & Power Co. v. United States,* 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921); *Marine Stevedoring Corp. v. Oosting,* 398 F.2d 900, 908 n.15 (4th Cir. 1968), *rev'd on other grounds sub nom. Nacirema Operating Co., Inc. v. Johnson,* 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969). And a stream that has never been navigated may nevertheless be "navigable waters" if it could be utilized with reasonable improvements in the streambed. *United States v. Appalachian Electric Power Co., supra,* at 407, 61 S.Ct. at 299.

In summary, the inquiry requires a three part examination of a stream's past, present, and future capability as an avenue of useful waterborne traffic. *Rochester Gas and Electric Corp. v. Federal Power Commission,* 344 F.2d 594 (2nd Cir. 1965). It is not, however, "every small creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable, but in order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture." *The Montello, supra,* 87 U.S. at 142. With these rules in mind, the court turns to an examination of the facts bearing on the navigable character of Lake Norman.

II. *The Facts.*–It is clear on the evidence that the plaintiff cannot establish navigability from Lake Norman's present capacity or future potential as an avenue of waterborne commerce. First, the undisputed evidence is that, while the lake supports a considerable number of boats, large and small, and some of the boats traverse the lake for purposes other than the recreation of their navigants, there is no commercial traffic on the lake in the sense of vessels carrying goods or passengers to other states or countries. Under current circumstances, such traffic would be impossible, since the Cowan's Ford Dam and the Mountain Island Dam a few miles downstream present absolute barriers to the passage of boats down the Catawba Valley from Lake Norman to South Carolina.

Second, undisputed evidence shows that the Catawba River from Lake Norman downstream to Camden, South Carolina, the present head of navigation, has no realistic potential for use as a navigable waterway. Massive dams stand in the way. Channels would have to be dredged through the granite of the river bottom and huge locks erected. Plaintiff has not suggested or attempted to prove the feasibility of such an undertaking. When it was last considered, during the Nineteenth Century, the Army Corps of Engineers concluded that the project was impractical.

If the Lake Norman portion of the Catawba River is part of the navigable waters of the United States, then it must be on the basis of a history of *past* navigation. This is the point on which the arguments and evidence of counsel have concentrated. Specifically, it must be shown that at some

time before the erection of the present dams, the Catawba River was in fact used for navigation up to and beyond the present site of the Cowan's Ford Dam.

The considerable body of historical evidence assembled by counsel establishes beyond doubt that the Catawba River has not been used in navigation north of Camden, South Carolina, for over a century. In 1875, in 1880, and again in 1887, the United States Army Corps of Engineers studied the potential navigability of the Catawba River from Old Fort (which is in the Blue Ridge Mountains one hundred miles west of Charlotte near the river's headwaters), to the South Carolina line, fifteen miles or so below Charlotte (defendant's exhibits 12–14). The Corps' reports establish that the present head of navigation was just north of Camden, South Carolina; that the river was not being used in navigation in North Carolina; and that the river's rate of descent, its numerous rocks, shoals and falls, its frequent stretches of rocky bottom, its severe periodic fluctuations in water level and its inadequate water volume at ordinary stages, rendered the river unfit for navigation in its natural state and an unworthy candidate for improvements to make it fit for navigation in the future. In 1875, S. T. Abert, a civil engineer, wrote: "The natural obstructions in the river between Old Fort and the State line are so formidable that it cannot be navigated in its present unimproved condition. Its trade is consequently nothing, and any future trade which is contingent on its improvement must be confined to timber, iron–ore, and agricultural products." H.R.Doc.No.94, 44th Cong., 1st Sess. 18 (1875). In 1880, Captain Charles B. Phillips of the Corps wrote that the North Carolina portion of the river was "so obstructed by falls and rapids that navigation is confined solely to skiffs, which ply upon the pools of comparatively still water that are occasionally met with." S.Doc.No.161, 46th Cong., 2d Sess. 2 (1880).

More specifically, between Rozzell's Ferry and the site of the boating accident in this suit lay Cowan's Ford Shoals–in the Nineteenth Century a four–mile stretch of rocks and small falls, where the river descended at an average rate of better than six feet a mile and ran at depths as shallow as six inches.

Plaintiff does not dispute this evidence. He has, however, presented considerable documentary evidence assertedly proving that the Catawba River was used in interstate navigation during the last half of the Eighteenth Century and the first third of the Nineteenth. This evidence, consisting of learned treatises, contemporary accounts, and expert opinion, does show that, during the early years of this region's history, the Catawba–Wateree River was used, for at least some of its reach, as a commercial highway. It is to be expected that this would have been the case. No doubt relatively more use was made of the area's natural waterways before the development of railroads reduced the need for a convenient water route and before the steamboat replaced shallower–draft boats as the dominant mode of water transport. *See United States v. Granite State Packing Co.*, 343 F.Supp. 57 (D.N.H.1972). A secondary account reports that during the 1820's, after a series of improvements on the South Carolina portion of the Catawba–Wateree system, "river traffic burgeoned.... In 1828, in one day, thirty–three boats arrived at the Camden wharves. *Those coming down the Catawba* were small craft, known as mountain boats, capable of carrying fifty bales of cotton." Savage, *River of the Carolinas: The Santee Canal* (Rev.Ed.1968) 250 (emphasis added).

The question, however, is whether such use as was made of the river extended *so far upstream as to bring the Catawba north of Cowan's Ford* within the "navigable waters of the United States." The documentary evidence which plaintiff has assembled shows that there was considerable interest in *making* the river navigable during that period. In 1788, the North Carolina General Assembly granted an exclusive charter to a South Carolina company to develop the Catawba for navigation. In 1796, this grant was withdrawn. The repealing statute recites:

"Whereas thirty–four thousand inhabitants of this state, in the counties of Burke, Lincoln, Mecklenburg, and Iredell, are most interested in the navigation of the Catawba River and South Fork . . . and have represented, that the said company *instead of opening the said navigation for the distance of one hundred miles of the main river*, and fifty miles of the South Fork in this state, *for the benefit of the said inhabitants, sooner than they themselves might or would have opened the same* . . . have for many years altogether failed; and it is now represented that the said act has operated to obstruct and prevent the said inhabitants from opening the said navigations themselves, . . . and whereas it hath been represented to this General Assembly, that no locks or canals are necessary for the navigation of those rivers in this state, and that the inhabitants who live within five miles are able to remove the obstructions, and open the said rivers sufficiently for boat navigation, with twelve days labor for each man, without aid from the public . . . and have further represented, that the value of the produce of the lands in that part of the state is greatly diminished for want of a conveyance easier and cheaper than land carriage; therefore, that the immediate opening of the said rivers, is of great importance to the counties aforesaid. . . ."

Laws of North Carolina, 1796, Ch. xxxii (emphasis added).

Later, another private company was chartered to improve the Catawba for navigation. Hamilton Fulton, a state civil engineer, filed a detailed report in 1820 with the Board of Internal Improvements of the State of North Carolina, summarizing the activities of the company to date and setting forth in painstaking detail the further measures needed to create a continuously navigable body of water from the vicinity of Morganton to the state line.

Governor Archibald D. Murphey (1777–1832), an enthusiastic promoter of internal improvements, referred in an address to the need to "render" the Catawba, among other rivers, navigable. He saw the chief natural obstacles to navigation as being in South Carolina, and noted that "[t]he appropriation of a million of Dollars for internal improvements, made by the Legislature of South Carolina, at their last Session, insures the improvement of the Catawba; and the farmers on that River *will soon have a water carriage for their produce.*" The Papers of Archibald D. Murphey 141 (1914) (emphasis added).

The considerable historical evidence tendered by both sides supports a number of conclusions. There was evidently substantial public interest in making the Catawba navigable. Notable persons thought it to be a desirable goal, and believed it could be accomplished. Efforts were made to bring it about. Numerous portions of the river had the capacity to be negotiated successfully by boats and other portions did not. What the contemporary documents do not establish is that North Carolinians were at any time actually setting boats upon the waters of the Catawba for purposes of carrying on trade with South Carolina or points beyond. Evidence of substantial interest in making a stream navigable in the future does not, without more, make it navigable in fact. *See, e. g., Oklahoma v. Texas,* 258 U.S. 574, 585–86, 590, 42 S.Ct. 406, 411, 412, 66 L.Ed. 771 (1922); *United States v. 531.10 Acres in Anderson County, S. C.,* 243 F.Supp. 981, 986–87 (D.S.C.1965).

Plaintiff's best evidence is found in two secondary sources which would support an inference that boats in commerce did ply some portion of the North Carolina Catawba prior to the 1840's. Secondary sources relied on by defendant are directly contrary, however. *See,* Cappon, *Iron–Making–A Forgotten Industry of North Carolina,* 9 N.C. Historical Review 331, 337–341, 343–45 (1932); Crittenden, *Inland Navigation in North Carolina,* 1763–1789, 8 N.C. Historical Review 145, 146–47 (1931). Several iron–works were established after 1788 in southern and eastern Lincoln County, along the South Fork of the Catawba and on Leeper's Creek. At one point, Cappon states that several iron manufacturers

"transported their goods down the valley by road or river, to and beyond Camden, ever watchful to make the most of a dry season when the river was tardy in rising sufficiently to allow boats to ascend"–apparently to beat out competing northern iron shipped up the river from Charleston. But Cappon goes on to say, "New roads were being projected into South Carolina, and the Lincoln works were not so far distant that wagons could not be successfully used in carrying their goods to Camden in less time than the four weeks which Charleston merchants had to allow to market their goods and return." *Id.* at 339–40. Later, Cappon explained that the "full potentialities" of the nascent iron industry in Lincoln County were "never realized."

"Closely allied to the plantation system as a subsidiary enterprise, it failed to reach out beyond the limited markets of the local area. Primitive technique and a general disregard for scientific improvements, already referred to, were both a cause and a result of this comparative isolation. Another important factor was the lack of anything approaching adequate transportation. Although railroad construction began early in the Carolinas, it advanced tardily and did not reach the area of iron manufacturing until the 'fifties. The ordinary country road fell into wretched condition during the rainy season, *but since the rivers were not navigable so far upstream*, wagons were still indispensable."

*Id.* at 344 (emphasis added).

The one ambiguous statement that manufacturers used the waters of the Catawba– as opposed to the land along its banks– within North Carolina as a commercial highway is found in a history of General Joseph Graham, a leading Lincoln County ironmaker, published by his grandson, Major William A. Graham. W. Graham, *General Joseph Graham and His Papers on North Carolina Revolutionary History* (1904). That author reports that the Graham ironworks supplied the countryside east to Fayetteville and south to Camden:

"When crops were 'laid by' and between gathering and planting time, teams would haul the goods to different points, as Salisbury, Hillsborough, Greensboro, Wadesboro, Camden, Cheraw, etc., where they were deposited with agents.... These works supplied the United States Government with cannon balls and perhaps other products during the war of 1812–'14. *These were hauled to the Catawba River and shipped by flat–boat to Charleston....* General Graham ... advocated cleaning out the rivers for navigation to the highest available point and then constructing turnpikes across the country from the 'landings' on the principal rivers.... While a member of the Legislature he voted for the measure to render the Catawba River navigable and granting appropriation for that purpose. *Up to the time of his death there was boating on the Catawba River from Abernathy's (Rozzell's) Ferry to Charleston, S.C. These boats passed by canal at Columbia from the Pee Dee* [Wateree?] *to the Congaree.* The shoals or ledges of rock in the river where very extensive were avoided by cutting a canal around them. At Mountain Island, in Gaston County, one of these canals still exists...."

. . . . .

"With the advent of railroads boating ceased on the Catawba."

*Id.* at 162–63 (emphasis added).

Assuming the author to be a competent witness–a fact not shown on the face of the writing–this account, together with the other evidence, still does not establish the navigability of the relevant portion of the Catawba River for purposes of admiralty jurisdiction or the Jones Act. First, the evidence of navigability is ambiguous, scanty and of uncertain competence. The amount of commercial traffic on the North Carolina Catawba which the evidence, if believed, tends to prove seems sporadic and insubstantial. Viewing the evidence as a whole, the stretch of the Catawba north of the state line appears to resemble much more those rivers that the courts have concluded were not "navigable waters of the United

States," *e. g., Oklahoma v. Texas*, 258 U.S. 574, 42 S.Ct. 406, 66 L.Ed. 771 (1922) (Red River in Oklahoma); *United States v. Crow, Pope & Land Enterprises, Inc.*, 340 F.Supp. 25 (N.D.Ga.1972) (Chattahoochee River from Atlanta to Buford); *United States v. 531.10 Acres in Anderson County, S. C.*, 243 F.Supp. 981 (1965) (Seneca River in South Carolina), than to resemble those streams which the courts have found to be sufficiently trafficked to fall within that category. *E. g., Economy Light & Power Co. v. United States*, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921) (Des Plaines River in Illinois); *State Water Control Board v. Hoffman*, 427 F.Supp. 585 (W.D.Va.1977) (Roanoke River to Smith Mountain Lake).

Even if we assume that navigation on the Catawba was sufficiently substantial to make some portion of the North Carolina river navigable waters of the United States, there is no evidence that this zone of navigability extended north of the present Cowan's Ford dam. Major Graham's work affirmatively shows that the northern terminus of such "boating" as was done on the Catawba was Rozzell's Ferry, a point about ten miles south, or downstream, by the river, from the present Cowan's Ford dam which retains Lake Norman. There is no reason to infer that any traffic on the water was conducted in the area north of Cowan's Ford, over the four–mile stretch of six–inch waters and steep rocks and shoals above described. There is no reason to assume that the Lincoln County iron manufacturers would have gone out of their way to deposit their Charleston–bound cannonballs in the river at the upstream end of the shoals.

The evidence is not sufficient to support a finding that in the Lake Norman area the Catawba River was ever "navigable" north of Cowan's Ford.

IT IS THEREFORE ORDERED that the action is dismissed.