**UNITED STATES of America,**
**Plaintiff,**
v.
**POT–NETS, INC., et al., Defendants.**

**UNITED STATES**
v.
**COZY–COVE, INC., et al.,**

**UNITED STATES**
v.
**L. P. FAUCETT, INC., et al.**
(two cases).

**UNITED STATES**
v.
**WM. G. ADKINS et al. (three cases).**

**UNITED STATES**
v.
**BAY PROPERTY, INC., et al.**
**Civ. A. Nos. 4488 thru 4495.**

United States District Court,
D. Delaware.
Sept. 4, 1973.

Ralph F. Keil, U. S. Atty., and Bruce L. Thall, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

James M. Tunnell, Jr., Wilmington, Del., and Robert W. Tunnell, Georgetown, Del., pro se and for the other defendants.

## OPINION AND ORDER

LATCHUM, District Judge.

These eight separate actions, consolidated for the purpose of considering cross-motions for summary judgment, involve leisure home development projects ("lagoon projects")[1] located generally in the southeastern section of Sussex County, Delaware near either Indian River Bay, Rehoboth Bay, Little Assawoman Bay or Assawoman Bay. All of the projects have been built in part on high land and in part on abutting marshland. It was the recent develop-

---

1. The names of the projects involved are: Pot-Nets (C.A. 4488) and Popular Thicket (C.A. 4490) near Indian River Bay; Cozy Cove (C.A. 4489), Massey's Landing (C.A. 4491) and Bayview Annex (C.A. 4493) near Rehoboth Bay; Treasure Beach (C.A. 4494) near Little Assawoman Bay: Keen-wik (C.A. 4492) and Keen-wik West (C.A. 4495) near Assawoman Bay. All of the projects except Treasure Beach, Keen-wik and Keen-wik West are located in the area called Long Neck in Indian River Hundred while the latter three projects are located in the area known as Dirickson Neck in Baltimore Hundred.

ment of the marshland which spawned the present spate of litigation.

As noted above in most instances the projects involved both high and marshland. The low land, which was usually soft and wet, was excavated by hydraulic dredges or dug out by draglines to create lagoons or canals. These lagoons serve several purposes. They provide a safe harbor for recreational boats and make a ready and convenient landing place ashore for those who reside in the projects. The lagoons, when bulkheaded, are more appealing esthetically than the marshes which they replaced. The dirt dredged from the lagoon was also used as fill behind the bulkheads on the remaining low lands upon which roads, playground areas, and living areas could be placed. The lagoons or canals further serve to provide surface water drainage for the necessarily flat and low terrain on which the projects are located.

1. *The Rivers And Harbors Act of 1899.*

These actions are based on the Rivers And Harbors Act of 1899. Section 10 of that Act, 33 U.S.C. § 403, provides that "any obstruction . . . to the navigable capacity of any of the waters of the United States is prohibited" except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army. That section also makes it unlawful to build bulkheads, excavate or fill in navigable waters, without such authorization, so as to alter or modify the course of the "channel of any navigable water of the United States."

Section 13 of the Act, 33 U.S.C. § 407, makes it unlawful (a) to discharge or deposit "any refuse matter" into any navigable water of the United States or any tributary thereof other than that flowing in liquid state from streets and sewers, and (b) to deposit "material of any kind" on the bank of any navigable water or a tributary thereof when it might be washed into the water and thereby impede or obstruct navigation. This provision also authorizes the Secretary of the Army in his discretion to exempt such deposits "provided application is made to him prior to depositing such material."

2. *The Complaints.*

Although many of the projects have existed since the mid 1960's or longer, these suits were not filed until October 17, 1972. The complaints first charge that the defendants, without obtaining prior authorization from the Corps of Engineers,[2] excavated lagoons in the marshlands, bulkheaded their sides and placed fill behind the bulkheads on surrounding marsh areas in violation of 33 U.S.C. § 403. Secondly, the complaints charge that the defendants have deposited refuse in navigable waters of the United States in violation of 33 U.S.C. § 407.[3] The refuse claimed to have been deposited is the material excavated in building the lagoons which was used to fill the surrounding marshes.[4] The complaints further allege that the illegal excavating, filling and bulkheading has caused and· is causing irreparable damage to the navigable waters of the United States including ecological harm to the marshlands by destroying and adversely affecting marine, bird and mammal wildlife. The Government therefore seeks an injunction barring further dredging, filling and bulkheading work at the projects and a mandatory order requiring the defendants at their expense to restore the marshes as near as possible to their previous natural states.

2. For brevity, the Court will refer to the Corps of Engineers as having permit jurisdiction under the Rivers And Harbors Act of 1899 even though the authority to issue the permit is placed in the hands of the Secretary of the Army upon the recommendation of the Chief of Engineers.

3. Docket Item 1, par. 4 (C.A. 4488).

4. Docket Item 10, Q. & A. 7 (C.A. 4488), Docket Item 1, par. 8 (C.A. 4488).

### 3. *The Contentions of the Parties.*

While it is not entirely clear,[5] the Government apparently contends first that since the waterways adjacent to the defendants' projects are navigable in fact (Pl.Br. pp. 1–11), the adjoining marshes, which were inundated by ordinary high tides (Pl.Br. pp. 11–22; 27–29), must also be deemed to be navigable waters of the United States within the meaning of the Rivers And Harbors Act of 1899. Alternatively, the Government seems to argue that even if the marshes were not navigable waters within the meaning of the Act before the original lagoons and canals were dug, they became navigable waters of the United States when they were partially built and connected to adjacent navigable waters so that any addition or extensions thereto could only be undertaken legally after obtaining a permit from the Corps of Engineers.

On the other hand, the defendants contend that the marshes on which the lagoon projects were built were not navigable waters of the United States at all, either in fact or derivatively (from the fact that in some cases they may have been adjacent to navigable bays). Secondly, the defendants argue that the natural or man-made canals or lagoons which do not lead to any public landing or place but merely dead-in into private property are either private or state waters and not navigable waters of the United States over which the Corps of Engineers has jurisdiction. (Def.Br. p. 9).

The parties in all eight cases, claiming that the facts in the record support their respective contentions set forth above, have moved for summary judgment in their favor.

### 4. *Applicable Law.*

The power of the United States over navigable waters stems from its authority to regulate commerce along the several states delegated to Congress by Art. 1, Sec. 8, Par. 3 of the United States Constitution. In determining the navigability of a waterway, the true criterion is capability rather than the manner and extent of use. The Montello, 87 U.S. (20 Wall.) 430, 22 L.Ed. 391 (1874). Lack of commercial traffic is no bar to a conclusion of navigability where personal and private use of boats demonstrates the availability of a waterway for the simpler types of commercial traffic. United States v. Appalachian Electric Power Co., 311 U.S. 377, 416, 61 S.Ct. 291, 85 L.Ed. 243 (1940); United States v. Utah, 283 U.S. 64, 82–83, 51 S. Ct. 438, 75 L.Ed. 844 (1931). Indeed under guidelines laid down in *Appalachian* a waterway is navigable and subject to federal regulation if (1) it is *presently* being used or is suitable for use, or (2) it has been used or was suitable for use in the *past*, or (3) it could be made suitable for use in the *future* by reasonable improvements [6] for transportation and commerce. Rochester Gas & Electric Corp. v. Federal Power Comm., 344 F.2d 594, 596 (C.A.2, 1965), cert. den., 382 U.S. 832, 86 S.Ct. 72, 15 L.Ed.2d 75 (1965).

The federal power to regulate extends to the entire bed of a navigable waterway and includes all lands below ordinary high-water mark. United States v. Rands, 389 U.S. 121, 123, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967); Unit-

---

5. The lack of clarity arises because the Government continually refers to "marshes" or "wetlands" on the assumption that these terms are synonymous with "navigable waters of the United States" which, of course, is not necessarily the case as hereinafter noted.

6. A determination of what constitutes reasonable improvements to make a non-naviga-

ble body of water into an interstate navigable waterway depends upon a balancing of cost and need at a time when the improvement would be useful. United States v. Appalachian Electric Power Co., supra 311 U. S. at 409–410, 61 S.Ct. 291; United States v. Crow, Pope & Land Enterprises, Inc., 340 F.Supp. 25, 35–36 (N.D.Ga.1972).

ed States v. Chicago, Milwaukee, St. Paul and Pacific Railroad Co., 312 U.S. 592, 597, 61 S.Ct. 772, 85 L.Ed. 1064 (1941); Shively v. Bowlby, 152 U.S. 1, 57, 14 S.Ct. 548, 38 L.Ed. 331 (1894). In fact, the most recent regulation of the Corps of Engineers in defining "navigable waters" for regulatory purposes has stated that its jurisdiction extends "laterally to the entire water surface and bed of a navigable water body, which includes all the land and waters below the original high water mark." 37 Fed.Reg.No. 176, § 209.260(j)(1). It also has declared that its jurisdiction "extends to the entire surface and bed of all water bodies subject to tidal action," that is, it "extends to the line on the shore reached by the plane of mean (average) high water" and that "marshlands" are navigable in law only so far as the area is "subject to inundation by mean high waters" (Id. at § 209.260(k) (1)(ii), (k)(2)).

### 5.  The Facts Are In Dispute.

The only uncontested issue in these actions is that no permits from the Corps of Engineers were issued for any of the projects in question.  As noted before, the Government contends that since (1) all the waterways adjacent to defendants' projects are navigable in fact and (2) the adjacent marshes on which the projects were partially built are inundated by ordinary high tides of those navigable waters, those marshes are also navigable waters of the United States and subject to the jurisdiction of the Corps of Engineers.  Both of these factual allegations are disputed by the defendants.  The statement that the adjoining waters are navigable in fact is

particularly disputed with respect to Cozy-Cove which borders on Lee Joseph Creek, also known as Wingate's Creek, with respect to Bayview Annex whose canals open into Ragged Island Creek and Lee Joseph or Wingate's Creek and with respect to Keen-wik West which adjoins Roy Creek.  Defendants' affidavits indicate that none of these waterways are navigable in fact or law.  Furthermore, with respect to Popular Thicket the record tends to show that none of its canals connect to any body of water although the marsh on which they are constructed does adjoin Boat House Pond and Indian River Bay.

■  Moreover, the Government in answer to interrogatories contends that the marsh is tidal, presumably on the basis that it is covered daily during the ebb and flow of mean ordinary high tides.[7] This, however, is disputed by other equally competent evidence submitted by the defendants.  This evidence shows that the marshes were only covered by storm or unusually high tides, that for years they were fenced and used as summer pastures for horses and cattle, that marsh hay was cut in the fall for winter bedding and feeding of livestock, and that they had been drained of most fresh water run-off, pools and sloughs by the extensive ditching program undertaken by the Delaware Mosquito Control Commission with the aid of the Civilian Conservation Corps, a federal public work agency, between 1935 and 1938. In addition, U.S. Department of Interior Geological Surveys filed of record show that all of the projects are above the mean high water mark as determined by such surveys.[8]  Finally with respect to Pot-Nets and Popular Thicket, aerial photographs,[9] taken before the projects

---

7.  Where a precise determination of the mean high water line is necessary, it should be established by surveys based on the averages of all high waters over a period of 18.6 years.  Borax Consolidated, Ltd. v. Los Angeles, 296 U.S. 10, 22–27, 56 S.Ct. 23, 80 L. Ed. 9 (1935); Shalowitz, 1 Shore and Sea Boundaries, p. 88; State ex rel. Buckson v. Pennsylvania R. R. Co., 228 A.2d 587, 601

(Del.Super.1967);  37 Fed.Reg.No. 176, § 209.360(k)(1)(ii).

8.  Docket Item 28, C.A. 4488; Docket Item 16, C.A. 4490; Docket Item 22, C.A. 4492; Docket Item 12, C.A. 4493.

9.  Docket Item 28, Exhs. 2(b) and 2(c), C.A. 4488.

commenced,[10] show that the marshes were above a very pronounced sandy coastal barrier existing between the marshes and Indian River Bay.

In view of this disputed record, the Court may not resolve the issue whether the marshes are navigable waters within the meaning of the Rivers And Harbors Act on motions for summary judgment. Rule 56(c), F.R.Civ.P.

The Government's alternate contention is that once the lagoons were initially dredged so as to connect them with navigable waters, any extensions or additions could only be undertaken with Corps of Engineers approval. In answer to this the defendants contend that the lagoons or canals, which do not lead to a public landing but merely dead-in into private property, are either private or state waters and not navigable waters of the United States over which the Corps of Engineers has jurisdiction. The present record is insufficient to make any determination of this issue. For example, there is no indication of the use made of the canals or what capability they have, or how the public is excluded from the projects and canals or other evidence of their private nature. It should also be noted that in its latest regulations, issued on September 9, 1972, the Corps of Engineers claims jurisdiction of man-made canals if they open only on one end upon navigable water and in fact support interstate commerce yet they further state that "if a privately constructed and operated canal is not used for purposes of interstate commerce nor used by the public, it is then not to be considered navigable waters of the United States." 37 Fed.Reg. No. 176, § 209.260(g).

The Court concludes, after a close study and review of the present record, that there are material facts genuinely in dispute which preclude the entry of summary judgment as a matter of law in favor of any of the parties.

10. The aerial photographs were taken on May 7, 1938 and July 20, 1954.