United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued March 14, 2002 Decided May 3, 2002 

 No. 99-1397

 FPL Energy Maine Hydro LLC, 
 Petitioner

 v.

 Federal Energy Regulatory Commission, 
 Respondent

 American Rivers, et al., 
 Intervenors

 On Petition for Review of Orders of the 
 Federal Energy Regulatory Commission

 Catherine R. Connors argued the cause for petitioner. 
With her on the briefs was Matthew D. Manahan.

 Cynthia L. Amara was on the brief for amici curiae 
Clifton Power Corporation and New England Legal Founda-
tion in support of petitioner.

 Laura J. Vallance, Attorney, Federal Energy Regulatory 
Commission, argued the cause for respondent. With her on 
the brief were Cynthia A. Marlette, General Counsel, and 
Dennis Lane, Solicitor.

 Daniel H. Squire and IJay Palansky were on the brief for 
intervenors American Rivers, et al.

 Before: Sentelle, Rogers and Garland, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Sentelle.

 Sentelle, Circuit Judge: Petitioner FPL Energy Maine 
Hydro LLC (FPL), a hydroelectric facility, petitions this 
Court for review of two orders by the Federal Energy 
Regulatory Commission (FERC), the first determining that 
FPL is subject to licensing because the Messalonskee Stream 
on which FPL is located is "navigable" under 16 U.S.C. 
s 796(8), the second denying FPL's request for rehearing. 
Because we find that FERC's interpretation of the statute 
governing navigability is a reasonable one and that its naviga-
bility finding was supported by substantial evidence, we deny 
the petitions.

 I. Background

 The Messalonskee Stream (Stream) is a tributary of the 
Kennebec River (Kennebec) located in central Maine. It runs 
approximately ten miles from the Messalonskee Lake to the 
Kennebec, with four dams located along its stretch. The 
southernmost dam is the Union Gas Project, located approxi-
mately one mile up the Stream from the confluence of the 
Stream and the Kennebec. In between the dam and the 
Kennebec, beginning from the dam and progressing down-
stream, are two sets of rapids or "rips," a bridge, a third set 
of rips, and two islands that together span approximately 200 
feet downstream with a shallow shoal on the east side of the 
islands and a narrow and rocky channel on the west side. 
Below the islands the Stream widens and deepens as it 
encounters the backwater of the Kennebec. The Kennebec, 
itself a navigable water, empties into the Atlantic Ocean.

 Pursuant to section 23(b)(1) of the Federal Power Act 
(FPA), 16 U.S.C. s 817(1), a non-federal hydroelectric project 
must be licensed if it is located on a navigable water of the 
United States, as defined by 16 U.S.C. s 976(8), or if other 
criteria not relevant to this case are met. Because the four 
dams constitute one development unit, if one project requires 
a license, then they all must be licensed. See Kennebec 
Water District, 80 FERC p 61,208, 61,828 (1997). Thus if the 
Stream between the Union Gas Project and the Kennebec is 
deemed navigable pursuant to 16 U.S.C. s 976(8), all four 
projects require a license.

 Section 3(8) of the FPA defines navigable waters as 

 those parts of streams ... which either in their natural 
 or improved condition notwithstanding interruptions be-
 tween the navigable parts of such streams or waters by 
 falls, shallows, or rapids compelling land carriage, are 
 used or suitable for use for the transportation of persons 
 or property in interstate or foreign commerce....
 
16 U.S.C. s 796(8). This means that, to be navigable for 
purposes of the FPA, a waterway must form a highway for 
commerce with other states or with foreign countries, by 
itself or by connecting with other waters. See The Montello, 
87 U.S. (20 Wall.) 430, 439 (1874). Courts have determined a 
waterway to be navigable if "(1) it presently is being used or 
is suitable for use, or (2) it has been used or was suitable for 
use in the past, or (3) it could be made suitable for use in the 
future by reasonable improvements." Rochester Gas & Elec-
tric Co. v. FERC, 344 F.2d 594, 596 (2d Cir. 1965) (emphasis 
in original), see also Marine Stevedoring Corp. v. Oosting, 398 
F.2d 900, 908 n.15 (4th Cir. 1968), rev'd on other grounds, 
Nacirema Operating Co. v. Johnson, 396 U.S. 212 (1969); 
Sierra Pacific Power Co. v. FERC, 681 F.2d 1134, 1137-38 
(9th Cir. 1982). Navigability can be established based on any 
of these three requirements; each alone is sufficient. Roch-
ester Gas, 344 F.2d at 596.

 II. Proceedings Below

 The Union Gas Project is currently licensed by FPL (as 
successor in interest to Central Maine Power Company--the 

original licensee of the project). The original license for the 
project was issued in 1968 and expired in 1993. Since that 
time, the project has been operating on annual licenses. As 
part of a jurisdictional examination of several projects for 
which licensing might not have been required,1 the Office of 
Hydropower Licensing conducted a navigation report on the 
Stream in 1996. This report indicated that the Stream was 
not navigable because there was "no evidence of usage of the 
stream as a water highway, a continuous link for interstate 
commerce, either commercial or recreational, from above the 
project sites, past the projects, to the Kennebec River." 
Following a review of comments to the report, the Acting 
Director of the Office of Hydropower Licensing issued an 
order finding that the Union Gas Project was located on a 
navigable waterway and therefore required a license. See 
Kennebec Water District, 79 FERC p 62,041 (Apr. 21, 1997). 
On rehearing, FERC concluded the evidence submitted was 
inadequate to support a finding of navigability. See Kennebec 
Water District, 80 FERC p 61,208 (Aug. 6, 1997). Following 
petitions for rehearing on that order, FERC set the issue of 
navigability for a hearing before an Administrative Law 
Judge (ALJ) to determine, among other things, the physical 
characteristics of the Stream, the difficulty associated with 
navigating the Stream, and the nature and frequency of 
actual use of the river for recreational boating. See Kennebec 
Water District, 81 FERC p 61,073, 61,306 (Oct. 21, 1997). 
The ALJ, who did not address the physical characteristics of 
the Stream as they relate to navigability, found that the 
Stream was not navigable despite three "successful" and two 
"unsuccessful" canoe trips made for the purpose of litigation. 
See Kennebec Water District, 82 FERC p 63,004 (Jan. 14, 
1998). The ALJ also held that there was no evidence of 
"regular and substantial recreational use" to serve as a proxy 
for the simpler types of commercial navigation as allowed 
under United States v. Appalachian Electric Power Co., 311 
U.S. 377 (1940). FERC trial staff and several intervenors in 
the proceeding below filed exceptions to the ALJ's initial 

__________
 1 Union Gas was previously required to be licensed pursuant to 
FERC's incorrect interpretation of a different section of the FPA.

decision, which Central Maine Power opposed. Upon review, 
FERC concluded that the ALJ applied an incorrect legal 
standard by requiring evidence of "regular and substantial 
recreational use" for a finding of navigability. It therefore 
reversed the non-navigability finding and required FPL to 
obtain a license. See Kennebec Water District, 84 FERC 
p 61,027 (July 16, 1998). FERC based its navigability finding 
on the three "successful" canoe trips taken for purpose of 
litigation, as well as the physical characteristics of the 
Stream. Id. at 61,126. FERC denied FPL's rehearing re-
quest and these petitions for review followed.

 III. Analysis

 This case requires us to answer two questions: first, 
whether FERC's interpretation of "navigability" under the 
FPA was reasonable; second, if so, whether FERC's naviga-
bility finding was supported by substantial evidence. We 
answer both questions affirmatively.

A. "Navigability" Interpretation

 FPL argues that FERC departed from the statutory "suit-
able for use ... in ... commerce" test set forth at 16 U.S.C. 
s 796(8) (see also Rochester Gas, 344 F.2d at 596) and instead 
applied a mere "possibility of passage" test to determine 
whether the Stream is navigable. FPL contends that FERC 
conducted its navigability determination by looking only to 
three non-commercial, non-recreational test canoe trips that 
indicated it was possible to navigate downstream in unusual 
conditions, rather than looking to historical and present com-
mercial or recreational use by average canoeists. FPL fur-
ther contends that, in determining navigability, FERC deviat-
ed from its past precedent that requires more than just a 
showing of specialized, recreational boating where historical 
evidence of commercial use was lacking. FPL also faults 
FERC for relying on the flow created when the hydroelectric 
facility is generating to create navigability, as well as for 
failing to identify the commercial use to which the Stream 
could realistically be put.

 We reject each of FPL's arguments. Where an adminis-
trative agency is tasked with interpreting an ambiguous 
statute that it administers, a court will defer to that agency's 
interpretation so long as it is reasonable. See Chevron 
U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 
843 (1984). As the statute does not define when a waterway 
is "suitable for use ... in ... commerce," we assume that 
Congress intended FERC to address the ambiguity in the 
statute and develop an appropriate test. See United States v. 
Mead Corp., 533 U.S. 218, 229 (2001). We find that FERC's 
interpretation of navigability under the FPA, which was 
based on test canoe trips and the Stream's physical character-
istics in the absence of any commercial or recreational use, 
was reasonable and entitled to deference.

 At the outset, we may quickly reject FPL's argument that 
it was improper for FERC to rely on the flow created when 
the Union Gas Project is generating to create navigability. 
FPL confuses a finding of whether a waterway has always 
been navigable because an improvement could be made if 
reasonable in cost, with a finding of whether a waterway, 
together with its improvements, is presently "suitable for 
use." See Rochester Gas, 344 F.2d at 596. The question 
before this Court is whether the Stream, with the presence of 
the Union Gas Project and the flow created when there is 
generation, is presently navigable, see Washington Water 
Power Co. v. FERC, 775 F.2d 305, 332 (D.C. Cir. 1985), not 
whether the Stream was navigable prior to the Project's 
construction. See id. at 331-32.

 Turning next to FPL's primary argument, FPL contends 
that FERC's "possibility of passage" test: 1) ignored the fact 
that the Stream has never been used, either historically or 
presently, for commercial or private purposes, and 2) deviated 
from past decisions wherein FERC denied a finding of navi-
gability when the only evidence of actual use was specialized, 
recreational boating.

 All parties agree that the Stream has never been used for 
commercial traffic. But just because a body of water has not 
been used for commercial use does not mean that it is not 

susceptible to commercial use. See United States v. Utah, 
283 U.S. 64, 82 (1931). In Appalachian Power, 311 U.S. at 
416, the Supreme Court held that a lack of commercial traffic 
is not "a bar to a conclusion of navigability where personal or 
private use of boats demonstrates the availability of the 
stream for the simpler types of commercial navigation." 
Thus without evidence of commercial use, FERC may look to 
other types of use to establish navigability.

 In the past, FERC has often relied on evidence of recre-
ational use as a proxy for commercial suitability. Here, 
however, there is no evidence of recreational use of the 
Stream. In fact, the only evidence indicating actual use of 
the Stream comes from the three trips made for the purpose 
of litigation. Echoing the ALJ, FPL argues that this evi-
dence is insufficient to serve as a proxy for commercial 
suitability. Instead, FPL argues that FERC precedent re-
quires a navigability finding to be based on "regular and 
substantial recreational use" in the absence of actual commer-
cial use. We disagree. The statute and the case law make 
clear that evidence of actual use is not necessary for a 
navigability determination. "[T]he test [is] whether the river 
... is used, or capable of being used as a highway for 
commerce, over which trade and travel is or may be conduct-
ed in the customary modes of trade and travel on water." 
Economy Light & Power Co. v. United States, 256 U.S. 113, 
121-22 (1921) (emphasis added). To determine whether a 
waterway is capable of being used as a highway for com-
merce, evidence other than recreational use may be consid-
ered. That is, recreational use may be the most common 
proxy evidence FERC relies on for findings of commercial 
suitability, but FERC has never taken the position, nor will 
this Court take the position now, that recreational use is the 
only proxy evidence on which FERC may rely. "Recreation-
al boating is ... of interest because it is boating, not because 
it is recreational. Any similar personal or private use not 
involving recreation, such as use of a river as a means of 
personal transportation, would be equally relevant to a deter-
mination of suitability for commercial navigation." Kennebec 
Water District, 88 FERC p 61,118, 61,304 (July 28, 1999). 

FERC may therefore, in the absence of commercial use, rely 
on evidence other than recreational use if that evidence is 
relevant to a finding of navigability. The Supreme Court has 
identified at least two types of evidence, declaring that the 
"capacity [of a waterway to meet the needs of commerce] may 
be shown by physical characteristics and experimentation as 
well as by the uses to which the streams have been put." 
United States v. Utah, 283 U.S. at 83. In the absence of any 
"uses to which the [Stream] ha[s] been put," FERC acted 
consistently with Supreme Court precedent in relying on the 
three test canoe trips.

 FPL nonetheless argues that the test trips were of a type 
of specialized, recreational boating that FERC has previously 
disregarded when making navigability determinations. The 
cases on which FPL relies, however, are distinguishable from 
the facts before us. For example, in Pennsylvania Elec. Co., 
56 FERC p 61,435, 62,549-50 (1991), FERC determined a 
river was non-navigable because a substantial reach of the 
river could only be navigated by a kayak (or comparably 
specialized sporting craft designed for river running) maneu-
vered by an expert paddler. Similarly, in PacifiCorp Elec. 
Operations, 73 FERC p 61,365, 62,140 (1995), rehearing de-
nied, 74 FERC p 61,262 (1996), FERC determined that a 
waterway was non-navigable because "all of the evidence of 
use or suitability for use for recreation concerns use by 
skilled kayakers or whitewater rafters." FERC held that 
"[t]his is not the sort of recreational boating that [it] has 
recognized as demonstrating the suitability of a river for the 
simpler types of commercial navigation." Id. at 62,140-41. 
The river in PacifiCorp included Class IV rapids that could 
not be navigated easily without a specialized boat. In the 
present case, the Stream at most contains Class II rapids 
that were successfully crossed by a canoe. FERC has re-
peatedly found waterways to be navigable that may be tra-
versed by a canoe--a simpler type of commercial transporta-
tion. See, e.g., Appalachian Power, 311 U.S. at 415-16. We 
therefore find that FERC did not depart from precedent 
when it relied on successful test trips taken in canoes.

 FPL further argues that FERC's navigability test was 
flawed because FERC failed to identify the possible commer-
cial use to which the Stream may be put. We see no reason 
why FERC must identify the precise commercial use to which 
a previously unused waterway may be put in order for the 
Commission's finding of navigability to be upheld. The test is 
whether the waterway is presently "suitable for use for the 
transportation of persons or property in interstate or foreign 
commerce," not whether the waterway is presently suitable 
for a specific type of commercial activity named by FERC 
and approved of by an opposing party. 16 U.S.C. s 796(8); 
see also PacifiCorp, 73 FERC at 62,140 ("[I]n order to 
demonstrate that the [waterway] at the project site is a 
navigable water, [FERC] need only find that it was or is used 
or suitable for use to transport persons or property between 
the project site and [another navigable water]."). Conse-
quently, if the evidence in the record supports a finding that 
the Stream is suitable for transporting persons or property to 
the Kennebec, then this Court will uphold such a finding 
without adding a requirement that FERC identify a specific 
type of commerce associated with the transportation of per-
sons or property. The language of the statute does not 
require such a finding; neither do we.

 Even more important to our analysis, FERC did not rely 
on the test canoe trips alone when finding that the Stream 
was navigable. FERC also looked to the Stream's physical 
characteristics when making its navigability determination. 
See United States v. Utah, 283 U.S. at 83. Thus absent 
evidence of commercial or recreational use, FERC properly 
relied on both "physical characteristics and experimentation" 
to determine whether the Stream was suitable for use in 
commerce. Id.

 For the reasons stated, we find that FERC's interpretation 
of the FPA's navigability test was reasonable insofar as it 
necessarily relied on test canoe trips and the Stream's physi-
cal characteristics in the absence of past or present commer-
cial and recreational use of the waterway. It is therefore 
entitled to deference.

B. Substantial Evidence

 As our discussion of FERC's deference-worthy interpreta-
tion of the navigability test may suggest, we also conclude 
that FERC's finding of navigability is supported by substan-
tial evidence. 16 U.S.C. s 825l(b) ("The finding of the Com-
mission as to the facts, if supported by substantial evidence, 
shall be conclusive.").

 The "experimental" test canoe trips provide sufficient evi-
dence that the Stream is navigable. Three witnesses, all with 
differing interests in the litigation, successfully navigated 
downstream without incident, and two attempted and suc-
ceeded in navigating upstream, albeit with some difficulty. 
Although FPL made much of the difficulty associated with 
this upstream travel both in its brief and at oral argument, 
FPL failed to provide any explanation as to why an upstream 
trip--either made with ease or with difficulty--is necessary 
for a navigability finding when the evidence of successful 
downstream trips is clear. Nowhere in the statute or accom-
panying case law does it state that the transport of persons or 
property in interstate or foreign commerce must include two-
way transport. We do not view this case as an opportunity to 
suggest otherwise.

 In addition to relying on the three test trips, FERC made a 
separate determination that the physical characteristics of the 
Stream rendered it suitable for commercial navigation. The 
Supreme Court has held that a water's "capacity [for com-
mercial navigation] may be shown by physical characteristics 
and experimentation as well as by the uses to which the 
streams have been put." United States v. Utah, 283 U.S. at 
83. And in Montana Power Co. v. Federal Power Commis-
sion, 185 F.2d 491, 495 (D.C. Cir. 1951), this Court declared 
that "[i]f the stream's flow, depth, gradient, width and capaci-
ty make it 'suitable for use' in interstate commerce, it is 
subject to the licensing authority of [FERC]." In other 
words, a waterway may never have been used for transporta-
tion, commerce, or recreation, but nonetheless may be suit-
able for interstate commerce (and subject to licensing by 
FERC) based on its physical characteristics. See Loving v. 

Alexander, 745 F.2d 861, 864 (4th Cir. 1984) ("The extent and 
manner of use of a navigable river is not important as long as 
it is usable as an actual avenue of commerce.").

 The record includes sufficient evidence regarding the 
Stream's physical characteristics on which FERC relied in 
making its navigability determination. FERC noted that the 
Stream has a very slight gradient, has a depth of approxi-
mately three and a half to four feet when the dam is 
generating (although slightly shallower around the two is-
lands), is wide enough to support passage up and down the 
Stream and around the two islands, and has few obstacles 
(e.g., boulders and fallen trees) that a canoeist may steer 
around without difficulty. Kennebec Water District, 84 
FERC p 61,027, 61,125-26 (July 16, 1998). There is nothing 
in the record to suggest that the Stream's physical character-
istics preclude navigability when the dam is generating other 
than a water depth around the islands that is lower than the 
rest of the Stream. But the same record includes evidence 
that the three canoeists successfully navigated down the 
Stream and past the islands. For reasons already stated, the 
difficulty experienced by one of the canoeists traveling up-
stream past the islands does not negate the otherwise suffi-
cient evidence. Moreover, even though the dam does not 
operate all the time, thereby rendering the water level too 
low to navigate year round, navigability need not be available 
"at all seasons of the year, or at all stages of the water." 
Economy Light & Power, 256 U.S. at 122.

 FPL attempts to bolster its argument with evidence that 
the test trips upon which FERC relied were made during 
periods of unusual water conditions. FPL argues that this 
should negate FERC's navigability finding. That is, FPL 
argues that since "susceptibility of use as a highway for 
commerce should not be confined to exceptional conditions or 
short periods of temporary high water," the canoe test trips 
do not show the stream to be navigable. Loving, 745 F.2d at 
865; see also United States v. Utah, 283 U.S. at 87. True, 
the evidence indicates that two of the test trips took place 
during periods of high water, but that same evidence indi-
cates that the remaining test trip took place during a period 

of low water. FPL's witness navigated up and down the 
Stream when the Kennebec's flow was 4030 cubic-feet per 
second (cfs) (down from its average flow of 5000 cfs), an event 
which would have reduced the backwater effect from the 
Kennebec and lowered the already low depth of water around 
the islands. This is sufficient evidence that the Stream can 
be navigated both up and downstream during non-optimal 
water levels.

 We acknowledge that the evidence of navigability is not 
overwhelming. But to uphold FERC's navigability determi-
nation, we need only find that the evidence on which the 
finding is based is substantial. 16 U.S.C. s 825l(b); see 
Consolidated Hydro, Inc. v. FERC, 968 F.2d 1258, 1261 (D.C. 
Cir. 1992). The "substantial evidence" standard requires 
more than a scintilla, but can be satisfied by something less 
than a preponderance of the evidence. See Whitmore v. 
AFIA Worldwide Ins., 837 F.2d 513, 515 n.4 (D.C. Cir. 1988). 
We therefore find that the test trips, together with the 
Stream's physical characteristics, constitute substantial evi-
dence to support FERC's finding of navigability.

 IV. Conclusion

 FERC's reliance on test canoe trips and the physical 
characteristics of the Stream, in the absence of historical or 
present commercial or recreational use, is a reasonable inter-
pretation of the navigability test set forth in the Federal 
Power Act and is therefore entitled to deference by this 
Court. Moreover, the record includes substantial evidence to 
support FERC's navigability finding. Three witnesses were 
able to successfully navigate down the Stream, and the physi-
cal characteristics of the Stream support a finding of naviga-
bility. For these reasons, the petitions for review are denied.